UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE | : | |
| | : | **CHAPTER 7** |
| **ALAN E. WASKOWICZ** | : | **CASE NO. 23-20091-JJT** |
| | : | |
| **DEBTOR** | : | **MAY 26, 2023** |

APPLICATION BY TRUSTEE TO EMPLOY AND APPOINT
LAW OFFICES OF JEFFREY HELLMAN, LLC
AS SPECIAL ATTORNEY TO THE ESTATE

The application of Anthony S. Novak, Chapter 7 Trustee, pursuant to 11 U.S.C. Section 327, respectfully represents:

1.       Applicant is the duly qualified Trustee in this case.

2.       On February 12, 2023, Alan E. Waskowicz ("Debtor") filed for bankruptcy under Chapter 7 of the Bankruptcy Code.   The Debtor's 341 Meeting was held on April 10, 2023.

3.       Based on the Debtor's schedules, the testimony of the Debtor at his 341 Meeting of Creditors and subsequent documents provided to the Trustee, there appear to be a number of issues which may result in recovery of assets to the estate including:

a.       The Debtor appears to have made direct payments to the University of Rhode Island on behalf of his adult son in the amount of $25,563.50 within two (2) years of his Chapter 7 filing which might be recoverable by the bankruptcy estate.   The Trustee has made demand for return of these funds but to date, no return has been forthcoming.

b.       The Debtor was divorced some time in February 2020 which Divorce Decree provided the Debtor's ex-wife with an assignment of a lawsuit the Debtor had

-2-

pending against Bank of America.   The wife's claim against any recovery on this lawsuit appears to be $36,125.50, but said lawsuit may have a value in excess of that amount.   The bankruptcy estate is in need of counsel to investigate this lawsuit and perhaps pursue this lawsuit in the event it has recovery value in excess of $36,125.50.

        c.      The Debtor resides at 67 Little Fawn Road, Southington, Connecticut but claims he has no ownership interest in said property other than renting said property.   He lists no ownership of real property on his schedules.   However, the Debtor appears to be a party to an agreement regarding 67 Little Fawn Road that provides the Debtor with an interest that is more than just a tenancy on the property.   Suit may have to be brought to quiet title and/or interpret the Debtor's interest in said property.

        d.      The Debtor was a beneficiary of his father's Probate Estate of Donald Robert Waskowicz.   The Debtor was the fiduciary of the father's probate estate and sold a house that belonged to his deceased father.   That appears to be the 67 Little Fawn Road, Southington, CT property that is the subject of a "Sell and Stay Contract" between the Debtor and Easyknock, Inc. and/or EK Real Estate Fund I, LLC (copy of Agreement attached as Exhibit A) which purports to transfer title to 67 Little Fawn Road to Easyknock with the Debtor retaining some type of option to purchase said real property.

        Said Agreement may provide a possible asset to the Chapter 7 estate in regard to 67 Little Fawn Road or may allow recovery pursuant to 11 USC §548 and/or applicable Connecticut State recovery statutes.

-3-

The bankruptcy estate needs to engage counsel to review the legal aspects of this transaction and if necessary, commence an action to recover this real property for the benefit of the bankruptcy estate.

4.      These transfers may be avoidable by the Trustee as a preference payment pursuant to 11 USC §547 and/or fraudulent conveyances and/or as a preferential payment in accordance with 11 USC § 548.   In addition, upon the Trustee's information and belief, said transfers were made while the Debtor was insolvent.

5.      It is necessary that your applicant employ an attorney in connection with this case to represent the estate in pursuing the above reference transfers, including the bringing of   actions under 11 USC §544, §547, §548 and §550 and/or applicable Connecticut State Law regarding fraudulent conveyances and other potential claims.

6.      The Trustee proposes to hire Attorney Jeffrey Hellman of the Law Offices of Jeffrey Hellman, LLC.   The Law Offices of Jeffrey Hellman, LLC and its attorneys are duly admitted to practice before this Court, and are a "disinterested persons" as that term is defined in Section 101(14) of the Bankruptcy Code, and are qualified to act as attorney in this matter, and represents no interest adverse to the bankruptcy estate.

7.      The Trustee believes that the appointment of Attorney Jeffrey Hellman of the Law Offices of Jeffrey Hellman, LLC is in the best interests of this estate as the Law Offices of Jeffrey Hellman, LLC has litigated similar cases in the past and will prosecute this matter to conclusion on an expedited basis.

– 4 –

8.    Based upon the Declaration attached hereto, applicant believes that said attorney does not hold or represent any interest adverse to that of your applicant or the Debtor estate.   Said attorney will seek compensation based upon a contingency fee basis of one-third of any recovery made.   Said attorney would also be entitled to claim reimbursement for his actual and reasonable out-of-pocket costs and expenses in prosecuting the Action.

9.    The Law Offices of Jeffrey Hellman, LLC maintains Professional Liability insurance in the amount of $4,000,000.00/ $5,000,000.00 through Minnesota Lawyers Mutual Insurance Company, policy #3818611 effective July 1, 2022 through July 1, 2023 and policy #3818612 effective July 1, 2023 through July 1, 2024 and will maintain said insurance coverage during the pendency of its appointment.

WHEREFORE, your Applicant prays that he be authorized to employ the Law Offices of Jeffrey Hellman, LLC to represent this estate as set forth above, and that he have such other and further relief as is just.

ANTHONY S. NOVAK, TRUSTEE

By /s/ Anthony S. Novak
Anthony S. Novak
280 Adams Street
Manchester, CT 06042-1975
Tel: 860-432-7710
Email: anthonysnovak@aol.com
Fed. Bar #ct09074 (Connecticut)

-5-

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE | : | |
| | : | **CHAPTER 7** |
| ALAN E. WASKOWICZ | : | **CASE NO. 23-20091-JJT** |
| | : | |
| DEBTOR | : | |

### <u>AFFIDAVIT OF PROPOSED ATTORNEY</u>

STATE OF CONNECTICUT  )
                       ) ss: NEW HAVEN      May 25, 2023
COUNTY OF NEW HAVEN  )

     I, Jeffrey Hellman, hereby make solemn oath:

     1.  I am an attorney and counselor-at-law, duly admitted to practice in the State of Connecticut.

     2.  I am over eighteen (18) years of age and believe in the obligations of an oath.

     3.  I practice under the firm name of Law Offices of Jeffrey Hellman, LLC.   The law firm maintains and office for the practice of law at 195 Church Street, 10th Floor, New Haven, CT 06510 (the "Law Firm").

     4.  The Law Firm maintains Professional Liability insurance in the amount of $4,000,000.00/$5,000,000.00 through Minnesota Lawyers Mutual Insurance Company, Policy #3818611 effective July 1, 2022 through July 1, 2023 and policy #3818612 effective July 1, 2023 through July 1, 2024 and will maintain said insurance coverage during the pendency of its appointment.

     5.  I have no connection with Alan E. Waskowicz, the above-named Debtor, his creditors or any other party in interest herein or its representative attorneys except for this case.

     6.  I have received no retainer or payment in this case.

     7.  I do not represent or hold any interest adverse to the Debtor or to the Bankruptcy Estate of Alan E. Waskowicz upon the matters upon which I am proposed to be engaged, and I am a disinterested person within the meaning of 11 U.S.C. §101(14).

-6-

8.   Compensation for said services upon which I am proposed to be engaged regarding this potential action would be a contingency fee of 33-1/3 percent plus costs and disbursements. Detailed time and expense records will be included with this application for fees, even those based on a one-third contingency.

9.   I acknowledge that I have no authority to settle any litigation for the bankruptcy estate and that any settlement proposal must be presented, through the bankruptcy estate trustee, to the Bankruptcy Court and is not settled until the Bankruptcy Court enters an Order approving the settlement.

10.   I acknowledge that upon the receipt of proceeds from either a judgment or settlement I have no authority to either disperse or retain those proceeds but must immediately (no longer than the second business day after receipt) turn those proceeds over to the bankruptcy estate trustee.

_____

Jeffrey Hellman, Esq.

Subscribed and sworn to before me this 25th day of May 2023.

_____

Commissioner of the Superior Court/

Notary Public

CHRISTEN HORAN
Notary Public, State of Connecticut
My Commission Expires Dec. 31, 2024

# Sell and Stay® Contract Summary

## General Information

This is a complex transaction governed by detailed legal documentation. You are strongly encouraged to consult with an attorney. EasyKnock can work directly with your attorney to complete the transaction.

The transaction you are considering is composed of four main components (collectively the "Transaction Documents"):

- The Residential Real Estate Sales Agreement (the "Purchase Agreement")
- Residential Lease Agreement (the "Lease Agreement")
- Residential Real Estate Option Agreement (the "Option Agreement")
- Transaction Risk Factors ("the "Risk Factors")

Only the Purchase Agreement will be signed in this document package, all other components included as exhibits to the Purchase Agreement and will be signed at closing. Any term not defined herein shall have the definition attributed to it in the underlying Transaction Documents.

By purchasing the home located at 67 Little fawn rd (the "Property"), EasyKnock becomes the owner of the Property. Upon entering into a Lease Agreement with EasyKnock, you will become the tenant of EasyKnock and you will have certain rights, including an option to sell the property to a third-party (the "Option Purchaser") entitling you to direct the resale of the property (the "Sell & Stay Option"), as more fully described in the Option Agreement.

## 1. Selling Your House To EasyKnock: Understanding the Residential Real Estate Sales Agreement

As specified in section 2 of the Purchase Agreement, you are receiving cash proceeds consisting of $159000 (plus $1,000 currently being held in escrow as the contract deposit) and an option value of $116000, for a total consideration of $276000 (collectively the "Consideration"). Part of your cash proceeds will be used to pay a processing fee of $10350, as set forth in section 3 (ESCROW) of the Purchase Agreement, and Closing Costs, which include but are not limited to: title charges, settlement charges, diligence expenses (appraisal, inspection, and survey), transfer stamp/taxes, document preparation charges, and recording fees.

Simply put, the Consideration is a legal term for the compensation you receive for selling your home and consists of a cash and option value component. "Deposit" is money that EasyKnock immediately makes available towards closing costs (such as paying for the appraisal and inspection). "Funding Amount" is the cash consideration that EasyKnock will wire to the escrow agent at closing to be used for the following:



EXHIBIT A

- Payoff any existing debt on the property (e.g. mortgages, liens, back taxes, etc., if applicable)
- Payment of closing costs (if applicable, paragraph 3 of the sales agreement)
- Payment of EasyKnock processing fee (if applicable, paragraph 3 of the sales agreement)
- Payment of the first month of rent (if applicable)
- Payment of rent holdback (if applicable)
- Payment of security deposit (if applicable)
- Payment of any transfer taxes and a prorated portion of any property taxes assessed for the year

- After the above items are satisfied, you will receive the residual Funding Amount at closing via wire.

You acknowledge that EasyKnock is not extending credit or making a loan of any kind to you or on your behalf.

At closing, in addition to the Funding Amount and any applicable cash proceeds, you will receive a copy of the Lease Agreement, Option Agreement, and Transaction Risk Factors to complete and sign.

## 2. Renting Your House from EasyKnock: Understanding the Sell & Stay Residential Lease Agreement

At closing, you will be signing a one-year lease. Tenant will pay EasyKnock monthly Rent (the "Rent") in the amount of $1900 for the duration of the Lease Agreement. Rent is due no later than the first of the month. Please note: The above amount is the gross rent amount before any applicable holdback payments are applied.

Provided that the Sell & Stay Lease Agreement is in full force and effect, no Event of Default remains uncured and all Rent has been paid current, The Lease Agreement automatically renews upon expiration unless notice pursuant to the Lease Agreement is given by either parties.

The Rent is fixed for the first year, then increases annually by either 2.5% or an amount reflected by the increase in the cost of living as measured by the Consumer Price Index (whichever is greater).

The Rent is required to be paid on a monthly basis, unless you have prepaid a certain number of months in advance in accordance with the Rent Holdback.

The Landlord will repair or replace items as needed at Landlord's cost and expense in order to maintain the safety and habitability of the premises. Any expenses that are paid by the Landlord during the tenancy, except for real estate taxes, repairs and maintenance not related to Property Maintenance as set forth in Section 15 of the Lease Agreement and not caused by Tenant's own recklessness or negligence, homeowners association dues and owner's property insurance, will be accrued and deducted from the proceeds payable upon option exercise pursuant section 2(b) of the Option Agreement.

You are required to purchase renter's insurance. EasyKnock does not insure the contents of the home.

Subject to approval from EasyKnock, you may sublease to an immediate family member (e.g. son, daughter, grandson, or granddaughter) subject to approval from EasyKnock.

If you default on your lease; for example, failure to pay rent after being provided appropriate notice, the Default may result in the Option Counterparty selling the property pursuant to 2(c)(vi) of the Option Agreement. In such case, you are still entitled to the Third-Party Purchaser Option Price pursuant to section 2(c)(vi) of the Option Agreement.

**3, ACH Authorization for Rent Payments**

At closing you will be asked to complete an ACH Authorization Form. The ACH Authorization Form allows EasyKnock to automatically withdraw your monthly Rent obligations directly from your checking or savings account without further notice. It is important to ensure that you have the proper amount of funds before your monthly rent becomes due, as any reversals due to insufficient funds will result in an additional fee of $100.00.

**4, Exercising the Sell & Stay Option: Understanding the Residential Real Estate Option Agreement**

The Option Agreement gives you the right to direct EasyKnock to sell the Property to the Option Purchaser, who may be either a third-party or yourself.

As specified in your offer letter and the Residential Real Estate Option Agreement in section 1(c), your Option Exercise Price will be $164991.99999999997, and every year after the first year the option exercise price will compound and increase by either 2.5%; or an amount reflected by the increase in the cost of living as measured by the Consumer Price Index (whichever is greater).

If you wish to direct EasyKnock to sell the Property, you may initiate the process by contacting EasyKnock. You will control the sale process including choosing the asking price and agreeing to the final sale price. You may also select a real estate agent to list and market the property, but you are solely responsible for any fees or commissions paid to the real estate agent. When you inform EasyKnock you would like EasyKnock to accept an offer, EasyKnock will sign the Purchase Agreement, open an escrow and start the closing process. When the sale of the Property closes, you will receive the proceeds of the sale pursuant to section 2(b)(i) of the Option Agreement.

It is important to understand that the housing market and property condition will impact the outcome of a sale to another purchaser including the possibility that you may not be able to find anyone willing to purchase the property. EasyKnock, as the owner and landlord, does not guarantee that the you will receive any specified sum with respect to the exercise of the Sell &

Stay Option and does not guarantee that you will be able to sell, assign or transfer the lease, option or any of your rights under the lease or the option to a third-party. The appraisal you receive on your home during the initial purchase by EasyKnock will likely not be the same price that the home will sell for to a third-party.

EasyKnock does not guarantee that you will be able to or have the means to pay the Option Exercise Price at any point in time. At closing, upon payment of the Option Exercise Price and any additional sums pursuant to section 2(b)(i) of the Option Agreement, the title will transfer to the person indicated in the new purchase agreement and the existing lease will terminate.

## 5. Understanding the Transaction Risk Factors

At closing, you will be asked to initial each disclosure in the Transaction Risk Factors and attest that you have read and understand the Transaction Risk Factors. You should carefully review the risk factors with an attorney.

Consent Compliance

- EasyKnock is buying your house at an agreed to fair market value and paying a portion in cash and the remainder as an Option Agreement that allows you to control the timing and type of next sale

Initials  *A.W.*

- EasyKnock is charging you market rent to lease back your home.  We have discussed and agreed to this rental amount.

Initials  *A.W.*

- After closing, EasyKnock will become the owner of the home and you will become a tenant

Initials  *A.W.*

- You can break your lease at any time for any reason with no cost or penalty, and either buy-back your home at the repurchase price or instruct EasyKnock to sell it in the market

Initials  *A.W.*

- If the home is sold on the market, you retain the full sale price minus the repurchase price plus option fees owed to EK, less any closing costs. EasyKnock has no claim to any home price appreciation, nor can we guarantee that the home value will increase from the price we bought it for.

Initials  *A.W.*

# Residential Real Estate Sales Agreement

**This Residential Real Estate Sales Agreement** (the "Agreement") made as of
01 / 24 / 2022 between AlanWaskowicz, an individual residing at 67 Little fawn rd;
SOUTHINGTON, Connecticut 06489 (hereinafter referred to as the "SELLER"), and EK Real
Estate Fund I, LLC, a Delaware limited liability company, or its successors and assigns
(hereinafter referred to as the "BUYER"). Each of SELLER and BUYER shall be referred to
herein as a "Party" and collectively, as the "Parties".

## WITNESSETH:

**1. PROPERTY.** The SELLER, in consideration of the Purchase Consideration hereinafter
specified, hereby agrees to sell and convey, and the BUYER hereby agrees to purchase the real
property commonly known as 67 Little fawn rd; SOUTHINGTON, Connecticut 06489 and
specifically described in Schedule A attached hereto (the "Premises") subject only to the
encumbrances and exceptions to title set forth or referred to in Paragraph 9(e) and Schedule A
(legal description and exceptions, if any) attached hereto.

**2. CONSIDERATION.** The consideration for the purchase of the Premises is
$276000("Purchase Consideration"), which the BUYER agrees to pay as follows:

| | | |
|---|---|---|
| (a) | Upon the signing of this Agreement, payable to the Escrow Agent (as defined below) as set forth in Paragraph 3 below, receipt of which is acknowledged, subject to collection (the "Deposit"). If the Deposit or any portion thereof was paid to a third party prior to execution of this Agreement, BUYER directs that such amount be sent immediately to the Escrow Agent for handling per Paragraph 3 below and such amount be credited toward the Deposit: | $1,000.00 |

| | | |
|---|---|---|
| (b) | Upon delivery of the deed, by wire or by official cashier's or bank check drawn by and upon a federally-regulated or Connecticut state-chartered bank, or a bank that is a member of the New York Clearing House, the proceeds of which are immediately available (the "Cash Funding"): | $159000 |
| (c) | Subject to the terms and conditions of this Agreement and that certain Residential Real Estate Option Agreement ("Option Agreement") between BUYER AND SELLER which shall be executed on the Closing Date, the agreed upon value of the Option Agreement being granted to the SELLER (the "Option Value"): | $116000 |
| | **TOTAL                   PURCHASE CONSIDERATION:** | **$276000** |

The consideration set forth in Paragraph 2(c) is subject to change is not guaranteed to be available or to be paid to SELLER if certain conditions and requirements set forth in this Agreement are not met.

**3. ESCROW.** BUYER'S attorney (the "Escrow Agent") shall hold the Deposit in Paragraph 2(a), above, in escrow until closing of title or sooner termination of this Agreement in accordance with its terms, and shall pay over or apply the Deposit in accordance with the terms of this paragraph. The Escrow Agent shall hold the Deposit in an account for the benefit of the Parties. At the closing of title as contemplated hereunder, the Deposit shall be paid by the Escrow Agent to or as directed by the SELLER. If for any reason the closing does not occur and either Party gives notice to the Escrow Agent pursuant to Paragraph 30 demanding payment of the Deposit, then the Escrow Agent shall give prompt notice of such demand to the other Party. If the Escrow Agent does not receive from such other Party notice of an objection to the proposed payment within seven (7) business days after giving such notice, the Escrow Agent is hereby authorized and directed to make such payment in accordance with the notice. If the Escrow Agent receives such notice of objection within said seven (7) business day period, or if for any other reason the Escrow Agent in good faith shall elect not to make such payment, then the Escrow Agent may continue to hold such amount until otherwise directed by notice from the Parties to this Agreement or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, the Escrow Agent shall have the right at any time to deposit the Deposit and the interest thereon, if any, with a court of competent jurisdiction where the Premises is located and shall give notice of such deposit to SELLER and BUYER. Upon such deposit or other disbursement in accordance with the terms of this Paragraph 3, the Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

The Parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience and that the Escrow Agent shall not be liable to either Party for any act or omission on its part unless taken or suffered in bad faith, on account of gross negligence, or in willful disregard of this Agreement on the part of the Escrow Agent. SELLER and BUYER agree, jointly and severally (with right of contribution) to defend (by counsel selected by the Escrow Agent), indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses (including reasonable attorney's fees) incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to acts or omissions taken or suffered by the Escrow Agent in bad faith, on account of gross negligence, or in willful disregard of this Agreement on the part of the Escrow Agent. In the event the Deposit is deposited with a court of competent jurisdiction pursuant to the terms herein, the Parties to this Agreement hereby authorize the Escrow Agent to deduct the reasonable costs and attorney's fees associated with an action of interpleader.

The Escrow Agent may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.

The Escrow Agent acknowledges receipt of the Deposit by check or wire, subject to collection and the Escrow Agent's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this Agreement.

Escrow Agent or any member of its firm shall be permitted to act as counsel for BUYER in any dispute as to the disbursement of the Deposit or any other dispute between the Parties whether or not the Escrow Agent is in possession of the Deposit and/or continues to act as the Escrow Agent. The Parties waive claim to a conflict regarding this paragraph.

Escrow Agent shall have no liability for any loss of the Deposit occurring on account of FDIC limits for sums insured on deposit, except if caused by the gross negligence or willful misconduct of Escrow Agent.

It is specifically understood and agreed that at closing, BUYER shall tender to SELLER official, cashier's or bank checks drawn on a federally-regulated or a Connecticut state-chartered bank, or a bank that is a member of the New York Clearing House, the proceeds of which are immediately available, or wired funds. All checks shall be made payable to SELLER'S attorney as trustee for SELLER, unless otherwise directed in writing by SELLER or SELLER'S counsel for the balance of the Purchase Consideration due at closing as set forth in this Agreement less the amounts of all mortgage payoffs. Additionally, BUYER'S attorney shall tender separate bank or treasurer's check(s) to SELLER for payoff of SELLER'S mortgage obligations.

On or before ten (10) calendar days before closing, SELLER shall provide BUYER with written directions for each mortgage payoff stating the name of payee and the total amount of payoff together with a copy of the associated payoff statement(s). SELLER shall calculate the total payoff amount (including applicable per diems, late charges, etc.) that shall be in an amount sufficient to pay the mortgage in full. SELLER shall be responsible for obtaining the mortgage payoff letter, and preparing the mortgage payoff package(s) and transmittal(s).

Immediately after closing, SELLER'S attorney or the title company, as the case may be, shall wire or hand deliver or send via overnight carrier the payoff funds and package to the SELLER'S lender(s).

At Closing Seller shall pay $10350 to EasyKnock, Inc. as a processing fee; and Closing Costs as detailed in the HUD-1 Settlement Statement, provided to SELLER prior to closing. Closing Costs may include the following as applicable: seller transfer related taxes and fees imposed by the state or local jurisdiction, title examination, appraisal, property inspection, attorney fees (if an attorney is required according to state law), title insurance premiums, escrow agent, survey costs, and other costs to close, including escrows and prepaid items.

## 4. **FIXTURES**.

(a) Included in this sale, for the aforesaid Purchase Consideration, are the following items, all of which items the SELLER represents are owned by SELLER, not leased, and free from security interests, liens, and other encumbrances, insofar as any of them were located on the Premises at the time of BUYER'S inspection: refrigerators, freezers, ranges, built-in microwave ovens, heating, cooling, electrical and plumbing systems and fixtures, window or sleeve heating units, electric light fixtures, stove, storm windows and doors, window, mail box(es), and existing plants and shrubbery.

(b) Specifically **excluded** from the sale are:
Washing machines, dryer, dishwasher, trash compactor, garbage disposal, air-conditioners, microwave, security system, security cameras, pool, hot tub/spa, all pool equipment, mirrors, installed wall to wall carpeting, shades, venetian blinds, curtain rods, awnings, any affixed satellite dish(es), weathervanes, garage door openers with remotes, screens and screen doors

(c) The following fixtures are leased or subject to a security interest, lien, or other encumbrance:

## 5. MUNICIPAL CONTINGENCY and TITLE CONTINGENCY

(a) BUYER's obligations are contingent upon BUYER obtaining "reasonably satisfactory title" and "reasonably satisfactory municipal searches" to be completed no later than fifteen (15) business days from the execution date of this Agreement ("Title and Municipal Date").
   In the event one or both such searches are not reasonably satisfactory to the BUYER, BUYER shall have the right to terminate this Agreement by giving written notice as provided in Paragraph 30 of such termination on or prior to the Title and Municipal Date. Upon receipt of such notice, SELLER shall return all Deposit monies as soon as practicable as paid and, upon delivery of such funds, this Agreement shall terminate.

(b) For the purposes of this Paragraph 5, "reasonably satisfactory title" shall mean: (i) title which conforms to Schedule A and (ii) does not contain any restrictions on the use of the property which would significantly impair BUYER's stated intended use and enjoyment of the Property. Utility easements, so long as the same are limited to bringing service to the Property, shall not be deemed to impair the use and enjoyment of the Property.

(c) For the purposes of this Paragraph 5, a "reasonably satisfactory municipal search", if any, shall mean a search showing matters of public record which: (i) materially conform to the listing provided to BUYER by SELLER'S agent, (ii) conform to such facts that a physical inspection of the property shall reveal, (iii) do not reveal any unpermitted work or open permits requiring final municipal approval that are not likely to be cured by SELLER prior to closing and (iv) are internally consistent (for example, the assessor's records are consistent with health department records as to number of bedrooms in the home).

(d) Nothing in this Paragraph 5 shall limit the Parties' remedies as otherwise provided in this Agreement.

**6. CONDITION OF PREMISES.**   The Parties agree that this transaction is subject to the BUYER doing an inspection of said Premises within twenty (20) days of the execution of this Agreement and is satisfied with the physical condition thereof and agrees to accept at closing the Premises in the condition that the Premises were disclosed to be or were in as of the date of BUYER's initial home inspection, reasonable wear and tear excepted.

**7. DEED AND SELLER CLOSING EXPENSES.**   The SELLER, on receiving the total Purchase Consideration, shall, at the SELLER's cost and expense, execute, acknowledge, and deliver to the BUYER, or BUYER's permitted assigns, the full covenant General Warranty Deed (or appropriate Fiduciary's Deed) in recordable form, to convey to the BUYER, or BUYER's permitted assigns, the fee simple title to the Premises, free of all encumbrances except as hereinafter provided.   The SELLER shall thereupon pay all real estate conveyance taxes and shall complete and deliver to the BUYER the conveyance tax forms, and the same shall be filed by SELLER or by the title company. SELLER shall also pay all existing loans and/or liens affecting the Premises, including all penalties, release preparation costs, and applicable recording costs; any accrued and/or outstanding association dues or fees; fee (if any) to obtain lien payoff/estoppel letters/statement of accounts from any and all associations, property management companies, mortgage holders or other liens affecting the Premises; SELLER's closing fee, document preparation fee and/or attorney's fees; fee for preparation of deed; notary fee on deed; and financial institution (bank, credit union, etc.) wire transfer fee or commercial courier service fee related to the disbursement of any lien payoff(s). SELLER additionally agrees to permit any withholdings and/or to pay any additional sum due as is required under the Foreign Investment in Real Property Tax Act. Failure to do so will constitute a default by SELLER. In the event SELLER is subject to tax withholding as required by the Foreign Investment in Real Property Tax Act, (hereinafter "FIRPTA"), SELLER additionally agrees that such tax withholding must be collected from SELLER by BUYER's closing agent at the time of closing. In the event SELLER is not subject to FIRPTA, SELLER shall be required as a condition of closing, to sign appropriate affidavits certifying that SELLER is not subject to FIRPTA. It is SELLER's responsibility to seek independent tax advice or counsel prior to the Closing Date regarding such tax matters.

**8. CLOSING.** The deed shall be delivered to the Escrow Agent at such location as may be designated by BUYER or BUYER's lending institution, within **thirty (30) days from the execution date of this Agreement** at 10:00 A.M. or sooner by mutual agreement of the Parties hereto (the "Closing Date").

**9. TITLE.**

(a) If, upon the Closing Date, the SELLER shall be unable to deliver or cause to be delivered a deed or deeds conveying marketable title to the Premises as hereinafter provided, subject only to the items set forth in Schedule A and Paragraph 9(e) hereof, then the SELLER shall be allowed a reasonable postponement of closing not to exceed thirty (30) calendar days, within which to perfect title. If at the end of said time the SELLER is still unable to deliver or cause to be delivered a deed or deeds conveying a marketable title to the Premises, subject as aforesaid, the BUYER (i) may elect to accept such title as the SELLER can convey, without modification of the Purchase Consideration, or (ii) may reject such title. Upon such rejection, all sums paid on account hereof, together with any nonrefundable expenses actually incurred by the BUYER in the aggregate not to exceed the cost of an A.L.T.A. Homeowner's Policy (or the equivalent thereof) based on the amount of the Purchase Consideration shall be paid to the BUYER without interest thereon. Upon receipt of such payment, this Agreement shall terminate and the Parties hereto shall be released and discharged from all further claims and obligations hereunder. SELLER shall be entitled to require BUYER to provide reasonable proof of payment of said expenses.

(b) The title herein required to be furnished by the SELLER shall be marketable, subject only to the items set forth in Schedule A and Paragraph 9(e) hereof, and the marketability thereof shall be determined in accordance with the laws of the state of Connecticut from time to time in effect.Any and all defects, in or encumbrances against, the title which are not deemed to impair marketability under the laws of the state of Connecticut shall not constitute valid objections on the part of the BUYER, provided the SELLER furnishes any affidavits or other instruments which may be required by the applicable statutes. The title must be insured at standard premiums by Buyer's title insurance company.

(c) The SELLER represents that the Premises and the present use thereof are not in violation of any governmental rules, codes, permits, regulations or limitations, unless same have become legally nonconforming, and there are no violations of any enforceable restrictive covenant, agreement or condition subject to which title to the Premises is to be conveyed in accordance with the terms hereof. Between the date of this Agreement and the Closing Date as set forth in Paragraph 9, the SELLER will not do anything or allow anything to be done on or about the Premises which will result in any such violation. The SELLER represents that SELLER has not received any notice of zoning or building violations and that there has been no attempt to enforce same against the SELLER during the time in which the SELLER has owned the Premises. SELLER represents that SELLER has no knowledge of any special assessments levied or to be levied against the Premises which are not yet a lien on the Premises and has no knowledge of any existing improvements or work done on the Premises which may result in special taxes or assessments to be paid thereon.

(d) Notwithstanding anything to the contrary contained in this Agreement, in the event the SELLER after due diligence cannot obtain a release for any existing mortgage on the Premises at the time of the closing of title from the holder of said mortgage, or any assignee thereof, either because said holder will not release the mortgage without first receiving payment or because the holder has delayed in sending the attorney for the SELLER the release of mortgage, then BUYER and SELLER agree to close title notwithstanding the absence of the release of mortgage, provided the attorney for the SELLER furnishes the attorney for the BUYER, at the closing, with (a) a written payoff statement and a copy of the payoff check or wire form evidencing that payment of the unreleased mortgage is to be made in full at the time of the closing and (b) a fully-executed undertaking and indemnity to make said payment in the form annexed hereto, and further provided that a title insurance company reasonably satisfactory to the BUYER will issue a fee

policy at no additional premium which takes no exception for said mortgage or mortgages or which provides affirmative coverage against loss or damage by reason of said unreleased mortgage or mortgages.

SELLER shall exercise due diligence to obtain any such release or releases and will upon receipt thereof immediately record the same and forward a copy or copies thereof to BUYER's attorney with recording information.  If SELLER has not obtained such release within sixty (60) calendar days after closing, Seller shall give to BUYER's attorney an affidavit as required by law, together with the necessary recording fee.  This provision shall survive the closing.

(e) The Premises will be conveyed to and accepted by the BUYER subject to:

i. Any and all zoning and/or building restrictions, limitations, regulations, ordinances, and/or laws; any and all building lines; and all other restrictions, limitations, regulations, ordinances and/or laws imposed by any governmental authority and any and all other provisions of any governmental restrictions, limitations, regulations, ordinances and/or laws, provided the Premises are not in violation of same at the time of closing.

ii. Real property taxes and any and all existing tax payments that are a lien, but not due and payable as of the Closing Date; the BUYER shall by acceptance of the deed assume and agree to pay, any and all such tax payments, liens and assessments which may on or after the Closing Date be assessed, levied against or become a lien on the Premises.

iii. Any state of facts which a survey and/or physical inspection of the Premises might reveal, provided same do not render title unmarketable or uninsurable as determined under Paragraph 9(b) hereof (such exception is for purposes of this Agreement only and shall not be included in the deed, unless it was in the deed which SELLER received upon purchasing the property).

iv. Common law, riparian or littoral rights of others and/or other rights, if any, in and to any natural watercourse or body of water flowing through or adjoining the Premises, and all statutory and other rights of others in and to any such watercourse or body of water.

v. Unless otherwise specifically agreed between the Parties in writing, any municipal assessment other than taxes (such as for sewers and the like) shall be paid on a current basis by the SELLER and the balance assumed by the BUYER at closing.

vi. Such encumbrances as shown on Schedule A, if any.

**10. COSTS**. All sums paid by BUYER on account of this Agreement, including, without limitation, inspection and engineering fees, the reasonable expenses of the examination of title set forth in Paragraph 9 of this Agreement, and any survey of the Premises shall be the responsibility of Seller.

**11. [Reserved]**

**12. APPORTIONMENT**. All *ad valorem* taxes (including, without limitation, real estate taxes, school taxes, municipal utility district taxes, and special district taxes), fire district taxes, sewer taxes, sewer assessments and sewer use charges or other municipal assessments, water charges, rents, service contracts, dues and ordinary assessments of private associations, and common charges, if any, together with interest thereon, if any, shall be apportioned over the fiscal period for which levied as of the Closing Date. All adjustments shall be apportioned based upon a 365-day year and the actual number of days in the month in which the closing occurs. Condominium special assessments due and payable prior to closing shall be SELLER's responsibility. Any errors or omissions in computing apportionment or other adjustments at closing shall be corrected within a reasonable time following the closing, not to exceed six (6) months. The provisions of this Paragraph shall survive the closing.

**13. RISK OF LOSS.** The risk of loss or damage by fire or other casualty to the buildings on the Premises until the time of the delivery of the deed is assumed by the SELLER. Throughout the period between the date of this Agreement and the delivery of the deed, SELLER shall continue to carry the existing fire and extended coverage insurance on the buildings on the Premises. In the event that such loss or damage does occur prior to the delivery of the deed to BUYER, the SELLER shall be allowed a reasonable time thereafter, not to exceed thirty (30) calendar days from such loss or damage, within which to repair or replace such loss or damage to BUYER's reasonable satisfaction. In the event the SELLER does not repair or replace such loss or damage to BUYER's reasonable satisfaction within said time, the BUYER shall have the option:
(a) of terminating this Agreement, in which event all sums paid on account hereof, together with any nonrefundable expenses actually incurred by the BUYER will be paid by Seller. Upon receipt of such payment, this Agreement shall terminate and the Parties hereto shall be released and discharged from all further claims and obligations hereunder. SELLER shall be entitled to require BUYER to provide reasonable proof of payment of said expenses; or

(b) of accepting a deed conveying the Premises in accordance with all the other provisions of this Agreement upon payment or credit for the Purchase Consideration and of receiving an assignment of all insurance moneys recovered or to be recovered on account of such loss or damage, to the extent they are attributable to loss or damage to any property included in this sale together with the amount of the deductible withheld from payment, less the amount of any moneys actually expended by the SELLER on any repairs to said property.

The SELLER shall not be responsible for loss or damage to trees or other plantings due to natural causes.

**14. AFFIDAVITS/1099 REPORTING:**
(a) The SELLER agrees to execute, at the time of closing of title;
    i. (an affidavit, (1) verifying the non-existence of mechanics' and materialmen's lien rights, (2) verifying the non-existence of any tenants' rights, other than as set forth herein, (3) verifying the non-existence of any leases or security interests in personal property and fixtures being sold with the Premises (except as disclosed in Section 4(c) above), and (4) updating to the extent of SELLER's knowledge, any available survey, together with any other affidavit reasonably requested by the BUYER's lender or title company as to facts within SELLER's knowledge; and, if true,

    ii. a certificate affirming that SELLER is not a "foreign person" pursuant to Internal Revenue Code §1445, or a withholding certificate from I.R.S. If SELLER is unable to

provide an affidavit affirming same, the Parties agree to comply with all applicable laws including all relevant provisions under Internal Revenue Code §1445, et. seq., as amended.

(b) Unless otherwise provided, the BUYER agrees to execute and file a Form 1099 Report in connection with the Purchase and Sale of Real Estate as may be applicable to the transaction contemplated herein, and the SELLER must provide information relevant thereto.

**15. STATUTORY NOTICES/WAIVERS.** The SELLER gives notice to the BUYER of any statutory notices of waivers required by statute or regulation, including, without limitation, that the lead paint contingency granted pursuant to §42 USC 4852d as set forth in the Lead Paint Disclosure report attached to this Agreement has been waived or has been satisfied, and that the BUYER has no further testing period for lead paint. If a residential dwelling was built on the Premises prior to 1978, and BUYER receives a Disclosure of Information on Lead Based Paint and Lead Based Paint Hazards after mutual acceptance, BUYER may rescind this Agreement at any time up to three (3) days thereafter.

**16. SMOKE DETECTOR/CARBON MONOXIDE AFFIDAVIT.** At closing of title, SELLER shall leave the existing smoke alarms and carbon monoxide detectors in place and in working order and, SELLER represents that SELLER is not aware of any defects with respect to same.

**17. MAINTENANCE.** The house, grounds and facilities of the Premises shall be maintained by the SELLER between the date of BUYER's signing hereof and the date in which the SELLER no longer occupies the Premises as an owner. Maintenance shall include, but not be limited to, the mowing of lawns, the raking of fallen leaves, the removal of fallen trees and large branches (except in uncultivated areas), and the removal of snow and ice from walks and driveways. Additionally, the SELLER while in possession of the Premises as an owner shall be responsible for maintaining all electrical and mechanical systems, plumbing and perform or have performed all structural repairs at SELLER's own cost and expense. In the event there is a pool that has been opened on the Premises, SELLER shall continue to perform normal maintenance of same.

**18. DELIVERY OF PREMISES.** The Parties have agreed that, on or prior to the Closing Date, the SELLER and BUYER will enter into a Lease Agreement (the "Lease Agreement") and the Option Agreement, whereby SELLER will continue to occupy the Premises as a tenant of the BUYER pursuant to the terms of the Lease Agreement and the Option Agreement, which is attached hereto as Exhibit "A."

**19. DEFAULT.** If (a) BUYER is in material default hereunder, or, (b) on or before the Closing Date as set forth herein, BUYER indicates that BUYER is unable or unwilling to perform, and provided SELLER stands ready to perform SELLER's obligations, SELLER's sole and exclusive remedy shall be the right to terminate this Agreement by written notice pursuant to Paragraph 30 to BUYER or BUYER's attorney and the Escrow Agent and SELLER shall retain the Deposit as reasonable liquidated damages for BUYER's inability or unwillingness to perform. In the event such written notice of termination of this Agreement is given by SELLER, the Premises shall be free of any claims or interest of the BUYER therein by virtue of this Agreement, provided neither Party objects to same within five (5) business days of receipt of notice of termination.

It is the intention of the Parties hereto freely to make an advance provision on the date of this Agreement for such liquidated damages in order (a) to avoid controversy, delay and expense, and

(b) to specify now a reasonable amount agreeable to both for compensation to the SELLER for losses which may not be readily ascertainable or quantifiable, such as any of the following which might be necessary to place SELLER in the position SELLER would have been in had BUYER made timely performance: costs of carrying, maintaining, insuring and protecting the Premises; loss of interest income on the proceeds; loss of optimum market time, value and conditions; the uncertainty, delay, expense and inconvenience of finding a substitute BUYER; additional commissions, fees, taxes and borrowing expenses to meet obligations entered into in anticipation of performance.

In the event closing has not taken place within thirty (30) calendar days following the Closing Date as it may be extended pursuant to the provisions hereof, through no fault of the non-delaying Party, the delaying Party shall be deemed in default. If SELLER is in material default hereunder, BUYER shall have such remedies as BUYER shall be entitled to at law or in equity, including, but not limited to, specific performance.

**20. PROPERTY CONDITION DISCLOSURE FORM.** SELLER shall deliver to BUYER all disclosures and property condition reports required by applicable state and federal laws, in the time frame, form, and content required thereby. If the SELLER discovers, after his delivery of a disclosure statement to a BUYER, a material inaccuracy in any disclosure statement or the disclosure is rendered inaccurate in a material way by the occurrence of some event or circumstance, SELLER shall correct promptly the inaccuracy by delivering a corrected disclosure statement to BUYER or make reasonable repairs necessitated by the occurrence before closing. BUYER understands that the Seller's Property Condition Disclosure statement is not intended to replace a professional home inspection. BUYER understands and agrees that the Seller's Property Condition Disclosure statement contains statements made solely by SELLER

**21. DELIVERY OF DOCUMENTS.** Upon BUYER'S request, the SELLER shall deliver to the BUYER prior to closing any documents, informational materials, building plans and any surveys in the SELLER's possession pertaining to the Premises, the appliances and the systems on or within the Premises.

**22. RIGHT TO WITHDRAW.** This Agreement shall not be considered or construed as an offer by the SELLER. The SELLER reserves the right to withdraw this proposed Agreement at any time prior to the signature by both Parties hereto and receipt by the Escrow Agent, of the full payment of the Deposit set forth herein, and delivery of a fully executed Agreement to the BUYER at the address provided in Paragraph 30 or via electronic signature.

**23. ASSIGNMENT**. This Agreement and BUYER'S rights hereunder may be assigned by BUYER to an affiliate of BUYER without the consent of SELLER.

**24. ACCEPTANCE OF DEED.** The delivery and acceptance of the deed herein described shall be deemed to constitute full compliance with all the terms, conditions, covenants and representations contained herein, or made in connection with this transaction, except as may herein be expressly provided and except for the warranties of title.

**25. REPRESENTATIONS**. Unless otherwise specified herein, none of the representations made in this Agreement including all attachments shall survive delivery of the deed, and all representations by SELLER are made to the best of SELLER's knowledge and belief and without

duty of inquiry. SELLER shall have an affirmative obligation to notify BUYER if any of the representations in this Agreement or any attachment are no longer true. Except in the event of an intentional misrepresentation, if BUYER discovers prior to the closing of title any material representation contained in this Agreement or any attachment to be untrue, the remedy of the Parties shall be those available to them in the event of a valid defect in or objection to title, as set forth in Paragraph 9, above. In the event of an intentional misrepresentation or breach by SELLER of any of its representations set forth in Paragraph 26, BUYER shall have available all rights in either law or equity including SELLER indemnifying and holding BUYER harmless from and against any and all losses, claims, damages, liabilities or expenses stemming from or caused by such breach, including reasonable costs of investigation and reasonable legal fees and disbursements.

**26. SELLER'S REPRESENTATIONS.** SELLER represents and warrants to BUYER, as follows:

(a) SELLER is not presently, nor has SELLER been, a debtor(s) in a bankruptcy proceeding in which the bankruptcy court presently has continuing jurisdiction over SELLER's assets.

(b) The Premises is not in the hands of a receiver or other liquidating agent.

(c) SELLER is the sole owner, in fee, of the Premises.

(d) There are no leases, options to purchase or lease, rights of first offer or rights of first refusal, or rights to possess affecting the Premises and no person, other than Seller, has any rights or possessory interest in the Premises.

(e) The execution, delivery and performance of this Agreement in accordance with its terms, does not violate any material contract, agreement, commitment, order, judgment or decree to which SELLER is a party or by which it is bound.

(f) SELLER has the right, power and authority to make and perform SELLER's obligations under this Agreement and this Agreement is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms, subject to bankruptcy, reorganization and other similar laws affecting the enforcement of creditors' rights generally.

(g) SELLER has not received any written notice of condemnation proceedings being brought against the Premises and SELLER has no knowledge that any such proceedings are threatened.

(h) SELLER has not received written notice of and has no knowledge of any action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against SELLER with respect to the Premises which if adversely determined could have a material adverse effect on the Premises or interfere with the consummation of the transaction contemplated by this Agreement.

(i) SELLER is not, and is not acting directly or indirectly for or on behalf of, any person, group, entity or nation named by any Executive Order of the United States Treasury

Department as a terrorist, "Specifically Designated National and Blocked Persons," or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control and SELLER is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity, or nation.

(j) There are no mechanic's liens against SELLER with respect to the Premises and no work has been performed or is otherwise in progress on the Premises by or on behalf of SELLER that could result in a mechanic's lien being filed against the Premises.

(k) There have been no leaks into or out of the Premises in the last twenty four (24) months.

(l) That as of the date of Closing, the basement will be free of standing water and dry.

(m) SELLER has no knowledge of any violation, and has received no notice of any violation, of any applicable environmental laws with respect to the Premises or any portion thereof. SELLER has not, nor to the best of SELLER's knowledge has any other person, used, generated, stored, dumped, released, buried, dispersed or emitted any hazardous materials at, on, under or onto the Premises, nor are there any underground tanks at, on or under the Premises, nor are there any violations of environmental laws with respect to the current use of the Premises.

(n) There are no restrictions on the Premises, whether by HOA/Co-op bylaws or deed restrictions, that prevent the Premises from being leased or encumbered by an option in accordance with the Option Agreement attached hereto as Exhibit "A."

(o) There are (i) no restrictions on the Premises, whether by HOA/Co-op bylaws or deed restrictions, or (ii) actual notice of such restrictions has been provided from the SELLER to the BUYER in accordance with Section 30 of this Agreement.

The representations set forth in this Paragraph shall survive the closing of title.

**27. EFFECT; ASSIGNMENT**. This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors, and permitted assigns of the respective Parties. SELLER acknowledges that BUYER would not enter into this Agreement but for its assessment of SELLER's financial condition, creditworthiness, and other characteristics specific to SELLER, and therefore SELLER agrees not to assign any of its rights or obligations under this Agreement without the prior written consent of BUYER.

**28. COSTS OF ENFORCEMENT**. Except as otherwise expressly provided herein, in the event of any litigation brought to enforce any material provision of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and court costs, including interest as may be provided by law, from the other Party.

**29. GENDER.** In all references herein to any Parties, persons, entities or corporations, the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within Agreement may require.

**30. COUNTERPARTS/FACIMILE/ELECTRONIC MAIL/NOTICES.** This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement. The Parties hereto agree that this Agreement may be transmitted between them or their respective attorneys by facsimile or electronic mail and, upon evidence of receipt of same, shall constitute delivery of this Agreement. The Parties intend that faxed or electronic signatures constitute original signatures and that an Agreement containing the signatures (original, facsimile or electronic) of all the Parties is binding on the Parties once sent via facsimile or via electronic mail or delivered to the other Party's counsel

All notices under this Agreement shall be in writing and shall be delivered or sent by email, facsimile transmission, certified mail, or by overnight courier, addressed to the attorney for the respective Party, and if SELLER has not retained an attorney, to SELLER at the Premises address. Notice signed by the respective attorneys shall be deemed sufficient within the meaning of this paragraph without the signature of the Parties themselves. Electronic signatures of the Parties and of the attorneys for the Parties on this Agreement, notices, or amendments to this Agreement shall be deemed to have the full force and effect of an original signature.

Each Party authorizes their attorney, if any, as attorney-in-fact to execute all documents as may be required to effectuate the terms and conditions of this Agreement, once executed by the Parties, including documents that may be reasonably requested and related to BUYER's lender's requirements.

| Notices to the SELLER shall be sent to: | AlanWaskowicz<br>67 Little fawn rd;<br>SOUTHINGTON,Connecticut 06489<br>8603026507<br>alanwaskowicz@gmail.com |
|---|---|
| BUYER shall be sent to: | EK Real Estate Fund I, LLC<br>c/o EASYKNOCK, INC.<br>111 W. 33rd Street<br>#1901<br>New York, NY 10120<br>Attn:  Jarred Kessler<br>Phone:    (844) 888-9213<br>E-mail: tenant@easyknock.com |

**31. ENTIRE AGREEMENT.** All prior understandings, agreements, representations and warranties, oral and written, between SELLER and BUYER are merged in this Agreement and specified riders or attachments hereto. This Agreement completely expresses the agreement of the Parties, and has been entered into by the Parties after discussion with their respective attorneys and after full investigation, neither Party relying upon any statement made by anyone else that is not set forth in this Agreement. Neither this Agreement nor any provision hereof may be waived, changed or canceled except by a written instrument signed by both Parties.

**32. GOVERNING LAW AND VENUE.** This Agreement shall be governed, construed and interpreted by, through and under the laws of the state in which the Premises is located, without giving effect to that state's conflicts of laws principles.

**33. CAPTIONS.** The captions preceding the paragraphs in this Agreement are for ease of reference only and shall be deemed to have no effect whatsoever on the meaning or construction of the provisions of this Agreement.

**34. SEVERABILITY.** The invalidity or unenforceability of any one or more provisions of this Agreement shall not render any other provision invalid or unenforceable. In lieu of any invalid or unenforceable provision, there shall be added automatically a valid and enforceable provision as similar in terms to such invalid or unenforceable provision as may be possible.

(SIGNATURE PAGES TO FOLLOW)

IN WITNESS WHEREOF, the Parties to these presents have hereunto set their hands and seals, as of the day first above written.

SELLER'S SIGNATURE:
By:

*Alan Waskowicz*

_____

AlanWaskowicz

BUYER
By: EK Real Estate Fund I, LLC, or its assignee

*Justin Doria*

_____

Justin Doria

-1-

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE | : | |
| | : | **CHAPTER 7** |
| **ALAN E. WASKOWICZ** | : | **CASE NO. 23-20091-JJT** |
| | : | |
| **DEBTOR** | : | |

### PROPOSED ORDER AUTHORIZING TRUSTEE TO EMPLOY LAW OFFICES OF JEFFREY HELLMAN, LLC AS SPECIAL COUNSEL TO THE ESTATE

Upon consideration of the application of Anthony S. Novak, Trustee, for authority to employ the Law Offices of Jeffrey Hellman, LLC to serve as Special Counsel in connection with this case (Doc ID #___), and the proposed affidavit of Attorney Jeffrey Hellman and it appearing that he is admitted to practice in this Court, and that the Court being satisfied that (i) pursuant to Title 11, USC §327(a), the Law Offices of Jeffrey Hellman, LLC does not hold or represent an interest adverse to the estate and is disinterested in the matters upon which it is to be engaged, and (ii) pursuant to §327(d), said employment is in the best interests to the estate; it is hereby

ORDERED that pursuant to §327(d), the application is APPROVED and that the Trustee is authorized to retain the Law Offices of Jeffrey Hellman, LLC as its counsel to negotiate settlement and/or commence and litigate a complaint pursuant to Title 11, U.S.C. §§544, 547(b), 548(a), 550 and/or applicable Federal or Connecticut State Law including fraudulent conveyances and any comparable theory in law or equity or other claims under federal or state law to recover sums claimed by the estate; and it is

FURTHER ORDERED that payment of compensation and reimbursement of expenses by the Law Offices of Jeffrey Hellman, LLC as counsel for the Trustee shall be computed on a contingent fee basis with allowance and payment on one-third (1/3) of amounts recovered, plus reasonable expenses, whichever is less, subject to further order of this Court after notice and a hearing upon proper application pursuant to §330 and 331; it is

-2-

FURTHER ORDERED that allowance of any such compensation for the Law Offices of Jeffrey Hellman, LLC shall not include compensation for the performance of any of the trustee duties that are generally performed by a Chapter 7 trustee without the assistance of an attorney; it is

FURTHER ORDERED that the Law Offices of Jeffrey Hellman, LLC has no authority to settle any litigation for the bankruptcy estate and that any settlement proposal must be presented, through the bankruptcy estate trustee, to the Bankruptcy Court and is not settled until the Bankruptcy Court enters an Order approving the settlement; it is

FURTHER ORDERED that upon the receipt of proceeds from either a judgment or settlement. The Law Offices of Jeffrey Hellman, LLC has no authority to either disburse or retain those proceeds but must immediately (no longer than the second business day after receipt) turn those proceeds over to the bankruptcy estate trustee; it is